J-S05018-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.D.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.U., MOTHER | : | No. 1142 WDA 2023 |

Appeal from the Order Entered August 21, 2023
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000166-2022

BEFORE: PANELLA, P.J.E., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.:                    **FILED: April 17, 2024**

Appellant, L.U. ("Mother"), appeals from the order entered in the Allegheny County Court of Common Pleas, which granted the petition of Appellee, Allegheny County Office of Children, Youth and Families ("CYF"), for involuntary termination of Mother's parental rights to her minor child, E.D.G. ("Child"). We affirm.

The Orphans' Court set forth the relevant facts and procedural history of this case as follows:

> [CYF] first became involved with Mother and Child in July 2014. CYF's involvement began shortly after Child's birth following an incident for which Mother was charged with and ultimately convicted of endangering the welfare of a child. Over the next several years, CYF continued to receive referrals alleging ongoing substance abuse, intimate partner violence, and lack of appropriate supervision for Child. Mother became incarcerated in 2018, at which time [Child's] maternal grandmother assumed care of Child. On June 20, 2019, Mother was released from jail and began having

contact with Child, though she was not permitted to be Child's full-time caregiver due to the conditions of her probation.

On August 26, 2019, CYF accepted the family for services due to concerns regarding substance abuse for both Mother and [the] maternal grandmother. In August of 2020, Child returned to Mother's care in a household that included Mother's partner, D.C. Although CYF did not initiate a dependency proceeding, CYF maintained contact with the family to ensure Mother was attending drug and alcohol treatment as both Mother and D.C. have a history of opioid addiction.

On March 19, 2021, CYF received the referral that ultimately resulted in Child's removal from Mother. CYF learned that Mother experienced severe injury and bruising to her arms and provided conflicting accounts regarding how the injuries occurred. The injuries themselves, along with observations of Mother's interaction with D.C., raised significant concerns regarding intimate partner violence. Neither Mother nor D.C. could provide verification of their drug and alcohol treatment and Mother failed to follow through on a requested drug screen. After unsuccessful efforts to gain Mother's cooperation and satisfy safety concerns, CYF obtained an emergency custody authorization[.]

CYF placed Child in foster care on March 25, 2021, where she has since remained. The court adjudicated Child dependent on May 19, 2021 and ordered that she remain in placement. The court found that the conditions requiring placement included Mother's need to participate in the level of drug and alcohol treatment recommended to establish and maintain sobriety, her need to demonstrate appropriate parenting capacity, and her need to address intimate partner violence concerns.

\* \* \*

At the time of Child's removal in March of 2021, Mother had been struggling with substance abuse and had failed to provide CYF with documentation of participation in any treatment program. The same remained true at both the time of the filing of the termination petition and at the

- 2 -

termination hearing.[1]  Since Child's removal, Mother has never provided any documentation confirming attendance at or completion of a drug treatment program.

Mother has additionally failed to attend and complete drug screens, attending only 10 out of the 55 requested between Child's removal and the filing of the termination petition.  Of those 10 screens, Mother tested positive for illicit substances on 5 occasions, indicating continuing use.  Indeed, during a home visit in July of 2022, the caseworker observed what appeared to be stamp bags outside Mother's house.  Upon making contact with Mother, the caseworker observed her to have glassy eyes and a freshly bleeding prick on a vein in her hand, again indicating active substance use.  The evidence established that at no time over the life of the case has Mother been able to demonstrate any sobriety.

In addition to Mother's failure to demonstrate recovery from substance abuse, Mother also failed to address CYF's and the court's concerns regarding intimate partner violence between herself and D.C.  Although Mother completed an intimate partner violence course in December of 2021, she has remained in a relationship with D.C. and has continued to deny the existence of any physical or verbal violence between the two even when reported by Child.  Further, Mother has demonstrated no understanding of or accountability for the impact … Mother's relationship with D.C. [has on Child].  Child has repeatedly expressed her desire to have no contact with D.C.  Despite Child's express wishes, Mother continued to discuss D.C. during visits and

_____

[1] Katie Baumgarten, the CYF caseworker assigned to Child's case, testified that Mother completed a drug and alcohol assessment prior to September of 2021 and no treatment was recommended.  However, due to concerns of substance abuse that arose subsequently, Mother was ordered to complete an updated drug and alcohol evaluation.  Mother was referred to a provider on four separate occasions to complete the evaluation and the provider made multiple unsuccessful attempts to complete a phone screening and schedule a level of care screening with Mother.  Despite these efforts, Mother had not completed an updated drug and alcohol assessment to date and Ms. Baumgarten had no knowledge or documentation indicating that Mother had completed a drug and alcohol evaluation with another provider.

attempt to contact him making Child extremely uncomfortable….

While Mother has been unable to demonstrate sobriety or address the concerns regarding intimate partner violence, Child has thrived in her pre-adoptive foster home. Both [Ms. Baumgarten and Amber Dornin, a caseworker at Every Child Foster Care,] have observed Child to be comfortable in [the] foster parents' care with all her needs being met. [Dr. Beth Bliss, Ph.D. Licensed Psychologist, conducted a] interactional evaluation between [the] foster parents and Child. Dr. Bliss observed Child to be bonded and attached to [the] foster parents and further observed that they interacted as a family unit.

Notably, Dr. Bliss also observed a bond between Mother and Child during their interactional evaluation in June of 2022. [Ms. Dornin] made similar observations. However, since the time of Dr. Bliss's evaluation, Child has become less willing to see Mother. Indeed, at the time of the termination hearing, Child's visitation with Mother had decreased to the point [that] it was solely at Child's discretion.[2] Given Child's strong bond with her foster parents, Dr. Bliss opined that their relationship, as well as Child's on-going participation in weekly counseling, could mitigate any potential detriment to Child from termination of Mother's parental rights. Dr. Bliss further testified that maintaining a relationship with Mother could cause detriment to Child if Mother appeared under the influence at visits, brought D.C. to visits, or visited inconsistently. These circumstances, Dr. Bliss opined, could be harmful and retraumatize Child.

(Orphans' Court Opinion, filed 11/27/23, at 2-8) (footnotes omitted).

---

[2] Ms. Baumgarten testified that Child typically had two supervised, in person visits and one virtual visit with Mother on a weekly basis. Mother never progressed to unsupervised visits with Child. Around January of 2023, the frequency of Mother's visits with Child decreased due to several instances where Mother failed to confirm her visits or appeared late. After this point, visits were scheduled at Child's discretion. Child elected to cancel several visits with Mother immediately prior to the termination hearing.

Additionally, Child's legal counsel testified that she has been representing Child for almost two years and had seen Child twice within 30 days of the termination hearing.[3] Counsel testified that Child initially wanted to return to Mother's care but later qualified her preference that she only wanted to return to Mother's care if D.C. was not present. In the months immediately preceding the termination hearing, Child indicated that she wanted to be adopted and understood that terminating Mother's parental rights is necessary to bring about that outcome. Based on Child's stated preference and counsel's observations of Child's welfare, counsel opined that termination of Mother's parental rights would best protect Child's interests.

On August 21, 2023, the court entered an order terminating Mother's parental rights to Child.[4] On September 19, 2023, Mother timely filed a notice of appeal and a contemporaneous concise statement pursuant to Pa.R.A.P. 1925(a)(2)(i).

Mother raises the following issues for our review:

> Did the [Orphans' C]ourt abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (8)?

> Did the [Orphans' C]ourt abuse its discretion and/or err as

---

[3] The court had appointed a separate guardian *ad litem* for Child prior to the termination hearing.

[4] The court also terminated Child's father's parental rights in the same order. Child's father did not participate in the termination proceedings and is not a party to this appeal.

a matter of law in concluding that CYF met its burden of proof by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S.A. § 2511(b)?

(Mother's Brief at 6).

In her issues combined, Mother contends that she undertook steps to eliminate the conditions that led to Child's removal and substantially complied with the court ordered goals. Mother asserts that she successfully completed an intimate partner violence program. Mother further claims that she underwent a drug and alcohol evaluation after which no substance abuse treatment was recommended. Mother argues that she submitted to a portion of the scheduled drug screens and only failed to appear at the others because of transportation barriers, conflicts with her work schedule, and illness. Mother insists that the results of her drug screen on November 29, 2022 show that she was negative for all illicit substances, demonstrating that she was able to maintain sobriety. Mother further asserts that she regularly visited Child and maintained a parental relationship with her. As such, Mother contends that there was insufficient evidence to show that Mother was unable and unwilling to provide essential parental care to Child or that Mother failed to address all the concerns that led to Child's removal.

Mother further avers that the evidence demonstrated that Child enjoys spending time with Mother and has a comfortable and easy relationship with her. Mother asserts that she has a strong bond with Child and terminating that bond would have a serious detrimental effect on Child. Mother concludes

that the court erred in terminating her parental rights pursuant to 23 Pa.C.S.A

§ 2511(a)(2), (8), and (b). We disagree.

Appellate review of termination of parental rights cases implicates the

following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972

A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may

uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191-92 (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

CYF filed a petition for the involuntary termination of Mother's parental rights to Child on the following grounds:

**§ 2511.  Grounds for involuntary termination**

**(a)   General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*     \*     \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*     \*     \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

- 8 -

* * *

> **(b)  Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (8), and (b).  "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions."  **In re Z.P., supra** at 1117.

> Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of her…parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

**In re L.M.**, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties.  **In re Z.P., supra** at 1117.  "Parents are required to make diligent efforts towards the

- 9 -

reasonably prompt assumption of full parental responsibilities." *Id.* at 1117-18. Under Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003). "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of CYF supplied over a realistic time. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of CYF's services. *In re Adoption of T.B.B.*,

835 A.2d 387, 396 (Pa.Super. 2003); *In re Adoption of M.E.P., supra*.

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have … her rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). "A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the parent's failure to fulfill his or her parental duties, to the child's right to have proper parenting

- 11 -

and fulfillment of his or her potential in a permanent, healthy, safe environment." *Id.* at 1013-14.

Instantly, the court determined that termination was proper under Section 2511(a)(2) and (8), explaining:

> In this matter, the court authorized Child's removal from Mother's care on March 24, 2021. Child was placed with her foster parents on March 25, 2021 and has remained in placement ever since. CYF filed its petition for termination on November 10, 2022, 19½ months after Child was placed. Thus, 19½ months had elapsed by the time the petition was filed, and almost 30 months had elapsed by the date of the termination hearing.
>
> At the time of adjudication, the court defined the conditions that required Child's placement as Mother's need to participate in the level of drug and alcohol treatment recommended to establish and maintain sobriety, her need to demonstrate appropriate parenting capacity, and her need to address intimate partner violence concerns. To address these conditions, the [c]ourt required Mother to participate in a drug and alcohol evaluation and follow all recommendations, comply with random urine screens, participate in domestic violence services, participate in coached or therapeutic visitation with Child, and attend supervised visits with Child. Over the subsequent months, the court held regular review hearings and consistently required Mother to engage in the same services identified at the time of adjudication.
>
> The evidence at the hearing revealed that Mother's engagement in the specified services either did not occur or did not remedy the conditions requiring Child's placement. Though Mother completed one drug and alcohol evaluation in the fall of 2021, she was continually referred for further evaluations due to evidence of continued use. Further, despite CYF's concerns regarding ongoing drug use, Mother failed to attend and complete a treatment program. Mother's attendance at drug screens was inconsistent and revealed that she continued to use illicit substances. Indeed, in July of 2022, the CYF caseworker observed

- 12 -

Mother under the influence with what appeared to be fresh marks on her skin from using drugs. At no time over the life of the case was Mother ever able to demonstrate her sobriety.

Regarding intimate partner violence, although Mother completed a course through the Women's Center & Shelter by December of 2021, Mother remained in a relationship with D.C. and refused to acknowledge the impact of his presence on Child. The CYF caseworker had ongoing conversations with Mother regarding D.C.'s presence over the life of the case. Despite Child's repeated requests that D.C. not be present and that she not be required to have contact with him, Mother refused to accept Child's stated wishes and instead insisted that Child was being coached. Even during her June 2022 evaluation with Dr. Bliss, Mother exhibited limited insight regarding the impact witnessing intimate partner violence could have on Child and continued to deny its existence in her relationship with D.C. Given Mother's relationship, the court continued to direct CYF to re-refer her for ongoing services as recently as July of 2023, though Mother never pursued further programming.

(Orphans' Court Opinion at 11-13) (footnotes omitted). The record supports the court's findings. *See In re Z.P., supra.* Despite Mother's assertions to the contrary, the evidence demonstrates that Mother has been unable to maintain sobriety throughout the pendency of this case.[5] Ms. Baumgarten testified that Mother failed to undergo an updated drug and alcohol assessment despite repeated referrals and attempts to schedule an assessment. Mother attended only 10 out of 55 drug screenings requested

---

[5] The fact that Mother attended one drug and alcohol assessment and tested negative at some drug screenings does not establish that Mother was maintaining sobriety, particularly in light of the overwhelming evidence to the contrary.

prior to the termination petition and tested positive for illicit substances on five of the occasions where she presented.[6] Additionally, Ms. Baumgarten testified to witnessing evidence of present drug use at Mother's residence during a home visit in July 2022.

Further, the record demonstrates that intimate partner violence continues to be a concern in Mother's life even after her completion of the Women's Center and Shelter course. Mother has never acknowledged the existence of intimate partner violence in her relationship with D.C., despite presenting on multiple occasions with signs of physical violence and Child's statements that she witnessed instances of violence. Multiple witnesses testified that D.C. continues to be a present in Mother's life. Additionally, Dr. Bliss's testimony demonstrated that Mother fails to fully comprehend or take seriously Child's repeated and expressed wish that D.C. no longer be present in her life. On this record, we discern no error in the court's determination that Mother's continuous refusal or inability to address substance abuse and intimate partner violence issues for the duration of this matter supports termination of Mother's parental rights pursuant to Section 2511(a)(2) and (8). *See In re Adoption of M.E.P., supra*; *In Interest of Lilley, supra*.

Regarding Section 2511(b), the court explained:

---

[6] Mother did not provide any proof of her claim that she was unable to attend the drug screenings due to various barriers, nor did she establish that she took any steps to address these issues so that she could comply with the court order in a timely manner.

- 14 -

Given the testimony of both Dr. Bliss and the foster care caseworker that Mother and Child have continued to share a bond over the life of the case, the court assumed its existence in considering the evidence. Despite the existence of the bond, Mother has demonstrated inability to prioritize Child's needs for safety and security over her own. The evidence demonstrated that Mother has failed to adequately address her struggle with intimate partner violence and substance abuse. Dr. Bliss opined that, should Child return to an environment where these issues remained unaddressed, "it would be extremely physically dangerous for her as well as emotionally traumatic." [(N.T. Termination Hearing, 8/11/2023, at 95).] Dr. Bliss further opined that Mother's continued relationship with D.C. despite Child expressing fear of him could have negative effects on her, testifying that there could be "internalization of the message that her mother [is] choosing the man over her and also, again, exposure to things that are causing her fear or trauma." [(*Id.* at 94).]

At the time of the termination hearing, Child had been in her pre-adoptive placement with [her] foster parents for over two years. During that time, Child has become strongly bonded and attached to her foster parents and has achieved stability in their care. Indeed, during an interactional evaluation in March of 2022, Dr. Bliss observed [that] Child and [her] foster parents [operated] as a family unit. Dr. Bliss made this same observation during a follow-up evaluation in February of 2023. At that time Dr. Bliss observed Child to have a "positive and secure attachment" to [her] foster parents. These conclusions were shared by both the CYF and Every Child caseworkers who observed Child to be comfortable in [her] foster parents' care and that they continued to meet all her needs. This bond, Dr. Bliss opined, could mitigate any potential detriment to Child from termination of Mother's parental rights.

Mother continues to need drug and alcohol treatment and intimate partner violence counseling, per her court-ordered goals. Given Mother's lack of progress toward her goals over the life of the case, the court justifiably concluded that Child's need for safety, permanency, and stability outweighs the possible benefit to her of maintaining her relationship with Mother. While Child and Mother may share a bond as

- 15 -

observed by caseworkers and Dr. Bliss, the evidence demonstrated that this bond is neither necessary nor beneficial, and consequently, Child will not suffer extreme emotional consequences from termination of Mother's parental rights. Accordingly, the evidence supports the [c]ourt's conclusion that termination of Mother's parental rights serves Child's needs and welfare.

(Orphans' Court Opinion at 18-19).

The record supports the court's analysis. *See In re Z.P., supra*. As such, we discern no error in the court's determination that termination is in Child's best interest under Section 2511(b). *See In re Adoption of C.D.R.*, 111 A.3d 1212 (Pa.Super. 2015) (affirming termination decision where court acknowledged that Mother and Child were bonded, but reasoned that termination would not be detrimental to Child and would serve Child's best interest and allow Child to find permanency with another family); *In re N.A.M.*, 33 A.3d 95 (Pa.Super. 2011) (explaining mere existence of emotional bond does not preclude termination of parental rights). Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 04/17/2024

- 16 -